**UNITED STATES of America**
v.
**Samuel WASHINGTON, Jr., Walter McCollough, James E. McCollough.**
**Crim. No. 278-67.**

United States District Court
District of Columbia.
Oct. 30, 1968.

Lawrence Lippe, Asst. U. S. Atty., for the United States.

C. S. McClelland, Washington, D. C., for Samuel Washington, Jr.

Allan M. Palmer and G. Richard Plenty, Washington, D. C., for Walter and James McCollough.

## MEMORANDUM AND ORDER

YOUNGDAHL, Senior District Judge.

This case was brought for trial on a four count indictment for robbery [1] and assault with a dangerous weapon.[2] As a preliminary matter, however, this Court heard testimony and oral argument on the motions of the defendants [3] for dismissal of the indictment or in the alternative, suppression of evidence of identification. While this Court finds no basis for dismissal of the indictment,[4] the totality of the circumstances surrounding the process of identification establishes a serious and irreconcilable breach with due process of law, requiring the suppression of all evidence of identification, including subsequent in-court identification at trial.

On October 4, 1966, at approximately 5:40 P.M. four men entered the Kay Jewelry Store located at 1243 Good Hope Road, S. E., in the District of Columbia. At that time the store manager, Mr. Daniel O'Connell, along with two employees, Mrs. Helen Potter and Mr. Stephen Stein, were at work in the store. Mr. O'Connell was engaged with a lady customer at the rear of the store, and Mrs. Potter was in a back room wrapping a package. Mr. Stein approached the four men to offer assistance. They indicated that they wished to see a particular watch in a jewelry case, and when Mr. Stein returned to the rear of the store to get the keys to that jewelry case, the events of the armed robbery began to unfold.

One of the perpetrators, identified by Mr. Stein and Mrs. Potter as Walter Mc-Collough, followed Mr. Stein to the rear of the store and held him at gun point while ordering Mrs. Potter to empty the cash from the safe and from the cash register. A second perpetrator, identified by Mr. O'Connell and Mrs. Potter as Samuel Washington, held Mr. O'Connell at gun point. A third perpetrator, identified by Mr. O'Connell as James Mc-Collough stood as a lookout in the front of the store.[5]

Shortly after the robbery, and on at least two occasions, Detective Harry Noone, who was the investigating officer assigned to the case, showed various photographs of suspected hold-up men to each of the three witnesses. The witnesses were unable to identify any of the photographs. Sometime later in November, 1966 Detective Noone was informed that the three defendants in this case and a juvenile had been arrested by the Alexandria Police Department on a robbery charge. After obtaining the photographs of the four from the Virginia authorities, Detective Noone, on December 1, 1966, showed the photographs to the witnesses for identification purposes.

At this point the record becomes somewhat blurred. There is conflicting evidence as to whether Mr. O'Connell was

---

1. 22 D.C.Code § 2901 (1967).

2. 22 D.C.Code § 502 (1967).

3. Prior to the hearing the Court granted the motion of defendant Washington for severance under Fed.R.Crim.P. 14. With the agreement of all counsel, however, the motions concerning identification were

consolidated to prevent the unnecessary duplication of testimony.

4. This disposition was not strongly urged by counsel for any of the defendants.

5. The fourth suspect, a juvenile, was turned over to juvenile authorities and therefore was not indicted with the three defendants.

shown only the four photographs of the suspects [6] or whether he was shown the four in a group of about twelve photographs.[7] In addition, there is some conflicting evidence as to whether Mr. O'Connell identified all four suspects [8] or only two as he now maintains.

On December 3, 1966, Mr. O'Connell was taken by Detective Noone to Virginia to view the McCollough brothers. Mr. O'Connell testified that he identified James McCollough in a cell with five or six other men, and that he did so spontaneously. There is some evidence, however, that the men in the cell were distinctly older than James McCollough and that attention had been called to him by an officer who told him to rise.[9] Furthermore, Mr. O'Connell testified that on the same occasion he viewed Walter McCollough alone in a cell but was unable to identify him. The officer's affidavit of events on December 3, 1966 would establish, however, that Walter McCollough was viewed in a cell with six other prisoners, and that Mr. O'Connell did identify him.

Again on December 8, 1966, Mr. O'Connell was taken to Virginia for identification purposes. At that time Mr. O'Connell identified Samuel Washington in the hallway leading to the courtroom, and pointed him out to Detective Noone while in the courtroom. It is unclear, however, whether or not Mr. O'Connell was alerted to the presence of Samuel Washington.[10]

Mrs. Potter's only corporeal view of the defendants occurred at a judicial proceeding during March, 1968 in the District of Columbia. Mrs. Potter was brought into a courtroom in which defendants Washington and Walter McCollough were sitting at counsel table. At that time she identified them both to Detective Noone. Mr. Stein, the third eye witness, did not view any of the defendants before arriving in court to testify at the hearing on these motions.

It should also be noted, that prior to this hearing there has been a significant amount of reviewing the case among the Government's witnesses. In fact, in a conference with the Assistant United States Attorney before the hearing Mrs. Potter and Mr. O'Connell again leafed through the photographs of the defendants, and by this time the photographs had been mounted on white paper upon which their respective names had been printed.

■ The events at issue in this hearing transpired prior to the trilogy of

6. Mr. O'Connell's preliminary hearing testimony is crystal clear:

> Q. Approximately how many photographs were you shown?
> A. I was shown four.
> Q. Four photographs?
> A. Yes, sir.
>     *       *       *       *       *
> Q. Were you shown any other photographs?
> A. No, sir.

In the Matter of Samuel Washington, Jr., preliminary hearing transcript, December 15, 1966, at 11.

7. At the hearing on these motions Mr. O'Connell testified that on December 1, 1966 he was shown approximately twelve photographs. When this inconsistency with his preliminary hearing testimony was pressed by the Court, Mr. O'Connell insisted that twelve photographs were shown to him, and that his testimony at the preliminary hearing must have been wrong. Mr. O'Connell did admit, however, that events should have been fresher in his mind at the time of the preliminary hearing.

8. Detective Noone's affidavit for an arrest warrant, sworn on December 7, 1966, indicated that Mr. O'Connell identified all four pictures.

9. Defendant James McCollough testified that on the advice of counsel he was not cooperating in jail house identification efforts, so that he had to be told by name to get up from his cot and join the other prisoners in a lineup.

10. Mr. O'Connell testified at the preliminary hearing that Detective Noone had brought him out to Virginia on December 8, 1966 to verify that the four men identified in the photographs were the robbers. At this hearing, however, Mr. O'Connell asserted that all he knew was that Walter McCollough would be on trial.

Supreme Court cases involving suspect identification procedures [11] and therefore the requirement of United States v. Wade,[12] and Gilbert v. State of California,[13] that counsel be present at identification confrontations does not apply. Despite the prospective application of *Wade* and *Gilbert,* however, Stovall v. Denno [14] requires that this Court inquire whether, under the totality of the circumstances, the identification procedures deprived the defendants of due process of law.[15] This Court adopts, as it has done on prior occasions,[16] the due process formula articulated in Simmons v. United States:[17] whether the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [18]

A finding of a due process violation does not, however, end the inquiry, for our own Court of Appeals has determined that "if * * * such a violation is found, the dispositional principles delineated in *Wade* and *Gilbert* should be applied analogously." [19] This Court must therefore consider whether, despite the violation, the Government has established "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [tainted] identification." [20]

This Court finds that Simmons v. United States [21] is dispositive of the due process question. As the Supreme Court pointed out in *Simmons:*

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. * * * Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witnesses only the picture of a single individual * * * or if they show him the picture of several persons among which the photograph of a single such individual recurs or is in some way emphasized. * * * Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen * * *.[22]

Despite this observation, the Supreme Court recognized the importance of photographic identification in criminal law enforcement "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." [23] For this reason the Court refused to establish a blanket prohibition against the use of photographs, but instead indicated that each case must be viewed on its own facts—balancing the necessity of using photographs

---

11. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951; 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

12. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967).

13. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed. 2d 1178 (1967).

14. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

15. Id. at 301–302, 87 S.Ct. 1967.

16. See, e. g., United States v. Trivette, 284 F.Supp. 720, 723 (D.D.C.1968).

17. 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

18. Id. at 384, 88 S.Ct. at 971.

19. Wright v. United States, No. 20,153, D.C.Cir., January 31, 1968, 404 F.2d 1256 at 1261.

20. United States v. Wade, 388 U.S. at 240, 87 S.Ct. at 1939, quoted with approval in Wright v. United States, No. 20,153, D.C.Cir., January 31, 1968, 404 F.2d 1256 at 1262.

21. 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

22. Id. at 383–384, 88 S.Ct. at 971.

23. Id. at 384, 88 S.Ct. at 971.

against the elements of suggestibility—to determine violations of due process.

The *Simmons* Court emphasized the fact that the perpetrators of a serious felony were still at large and that it was essential for the FBI to determine if the investigation was proceeding on the right track.[24] In the present case, however, the three defendants were already incarcerated in Virginia, and the necessity factor was therefore nil. In *Simmons* the elements of suggestibility were discounted by the following factors: the witnesses were shown the photographs only one day after the robbery when it was fresh in their minds; several photographs were shown; the pictures consisted of group photographs; and there was no evidence of suggestion as to which persons in the pictures were under suspicion.[25] In the instant case, however, comparable factors become persuasive elements of suggestibility. Here the photographs were shown to the witnesses approximately two months after the event, when memories would obviously have faded. At least with respect to Mr. O'Connell's identification, this Court finds that on December 1, 1966 he was shown only the photographs of the four suspects.[26] In addition to this suggestive practice, which was expressly *condemned* in *Simmons*,[27] the photographs of the four suspects contained the bold identifying feature printed across the front:

### ALEXANDRIA VIRGINIA POLICE DEPARTMENT.

Such markings must have suggested to the witnesses that these four men were presently in trouble in Virginia, if in fact it did not suggest that these four were now suspected by the District of Columbia police. In sharp contrast to *Simmons*, therefore, which represented a case involving a high degree of necessity for the photographic identification, and a low level of suggestivity, the present case involves no necessity whatsoever and quite a high level of suggestivity. Thus balanced, and in light of the factors deemed relevant in *Simmons* this Court finds a serious violation of due process.

While this Court believes that the photographic display alone establishes a violation of due process, there are other troublesome aspects of the identification process which merit comment. First of all, the entire absence of safeguards for a fair identification when Mr. O'Connell was taken to Virginia to view the McCollough brothers certainly raises the question of a *Stovall* violation. The fact that Mrs. Potter and Mr. Stein were not even taken to view the defendants is additional indication of the shoddy nature of the identification procedures. Furthermore, when Mrs. Potter did confront Samuel Washington and Walter McCollough in March, 1968, the conditions were hardly conducive to an independent identification. Finally, the later review of the four photographs must have cemented the results of the prior due process violations in the minds of the witnesses.

Of course any improvement in current practices cannot be considered as evidence of prior lapses in due process. Testimony elicited from Detective Noone at the hearing, however, comparing past and present practices demonstrates how frightfully neglected had been the entire procedure for pre-trial identification. The new *Wade-Gilbert* regulations of the Metropolitan Police Department are to be applauded, but in doing so this Court cannot fail to remedy the constitutional violations which prior practices tolerated.

▮▮ While a due process violation requires the per se exclusion of testimony at trial concerning the tainted identi-

---

24. Id. at 384–385, 88 S.Ct. 967.

25. Id. at 385, 88 S.Ct. 967.

26. This conclusion is dictated by the certainty of Mr. O'Connell's testimony at

the preliminary hearing, when events were admittedly fresher in his mind. See notes 6 and 7, supra.

27. 390 U.S. at 383, 88 S.Ct. 967.

fication,[28] an in-court identification will nonetheless be allowed, if the Government can establish by clear and convincing evidence that the in-court identification has been come at " 'by means sufficiently distinguishable to be purged of the primary taint.' "[29] Under the guidelines delineated in *Wade* for determining whether the courtroom identification could be independently arrived at [30] this Court finds that in the instant case the Government is unable to meet that burden. First of all, Mr. O'Connell's description of James McCollough as having a medium complexion is at variance with the fact, as pointed out during the hearing, that he is a dark skinned individual. With respect to his assailant, allegedly Samuel Washington, Mr. O'Connell admitted that he observed him for only fifteen to twenty seconds; that during the entire time a gun was trained on him; and that he did not observe any distinctive features. Mr. Stein identified Walter McCollough as his assailant, but when questioned by the Court concerning whether he could have made that identification if he had never seen the photograph his first answer was "I think so." [31] While Mrs. Potter identified both Samuel Washington and Walter McCollough she had little opportunity to observe the individual with Mr. O'Connell. Although she had a better opportunity to observe her own assailant, she had been pulled along to the safe, had fallen and gotten up, and was kept busy emptying the cash drawers during the time he was with her. Furthermore, it should be pointed out that the witnesses had never seen any of the individuals involved in the robbery prior to the events of October 4, 1966.

While the foregoing factors all militate against the Government's position that an in-court identification would have been independently arrived at, the most significant factor is time. The two-month time lag from the events of the robbery to the first photographic identifications, together with the fact that the initial tainted identifications have been reinforced by subsequent and highly suggestive identifications, casts serious doubt on the ability of any of the witnesses to independently recollect the identification of the robbers after more than two years have elapsed.[32]

For the foregoing reasons, it is ordered that the motions to suppress all testimony concerning prior identifications, as well as all subsequent in-court identification, should be, and are hereby, granted.

---

28. "That testimony is the direct result of the illegal [identification] * * *. The State is therefore not entitled to an opportunity to show that that testimony had an independent source." Gilbert v. State of California, 388 U.S. 263, 272–273, 87 S.Ct. 1951, 1956, 18 L.Ed.2d 1178 (1967).

29. United States v. Wade, 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

30. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup. 388 U.S. at 241, 87 S.Ct. at 940.

31. After continued inquiry from the Court Mr. Stein did assert his certainty, but his initial uncertainty is an important factor. See United States v. Trivette, 284 F.Supp. 720, 724 (D.D.C.1968).

32. On the basis of its experience this Court questions whether, in cases involving serious time lapses, the Government can ever meet its burden of establishing by clear and convincing evidence that an in-court identification would have a source independent of a prior due process violation in the identification process.